BERANTO TOWERS, PLAINTIFF, v. CITY OF
PASSAIC, DEFENDANT.

Tax Court of New Jersey

May 29, 1980.

*Pat DiIanni* for plaintiff.

*John J. McKniff*, Asst. City Counsel, for defendant.

CRABTREE, J. T. C.

This is a local property tax case in which the plaintiff seeks to eliminate an added assessment made with respect to the last 3 months of 1975. The defendant counterclaims from a judgment of the Passaic County Board of Taxation reducing the assessment.

The assessment and the action of the County Board were as follows:

|  | Assessment |
| --- | --- |
| Land | --0-- |
| Improvements | $2,000,000 |
| Total | $2,000,000 |
| Pro-rated 3 months | $500,000 |

|  | Co. Bd. Action |
| --- | --- |
| Land | --0-- |
| Improvements | $1,000,000 |
| Pro-rated 3 months | $250,000 |

The subject of the controversy is a luxury high–rise apartment building containing, upon completion, 120 apartments, distributed over 12 floors, 10 apartments to each floor. The property is located at 170–198 Lafayette Avenue in the City of Passaic and is further known and designated as Block (3)213, Lots 57, 60, 66 and 70 on the City Tax Map.

At issue in this case is the date upon which the subject property was completed for added assessment purposes within the purview of *N.J.S.A.* 54:4–63.1, which defines "completed" as "substantially ready for the use for which it was intended." The defendant contends that the property was completed before October 1, 1975, thus justifying imposition of the added assessment for the last three months of 1975. The plaintiff argues that the property was not completed before December 1 of that year, thus precluding any added assessment for 1975.[1] The

---

[1] *N.J.S.A.* 54:4–63.2 provides, in substance that an added assessment may be made pro–rata for the pretax year (in this case 1975) for the period between

partial assessment made as to October 1, 1975 for tax year 1976 is not in issue and the parties have agreed to defer proofs respecting the 1975 added assessment valuation to the trial of the 1976 case. As I find, for reasons hereinafter set forth, that the added assessment was improperly imposed for any part of 1975, the valuation issue is moot for that year.

As stated above, the subject property is a luxury high–rise apartment building with amenities customarily associated with such a structure: game room, sauna bath, heated indoor swimming pool and on–site underground parking. Monthly rentals in 1975 varied from $300 to $500, depending upon the floor, and the size and number of rooms. Utilities were not included in the rental.

The building in question was a focal point of intense activity during the months of September, October and November of 1975. Workers were busily engaged in all parts of the building in caulking windows, working on elevators and making recreational areas operable. The noise and commotion generated by workers unloading appliances and other items and transporting them from trucks to elevators to hallways rendered the premises uninhabitable prior to December 1, 1975. In addition, before that date, fixtures were not installed, sinks, cabinets, vanitorials and bathroom tiles were not in place, refrigerators and kitchen ranges, while in the apartments, were not hooked up, and hallway floors, made of rough concrete, were uncovered.[2]

---

the first day of the month following completion of the property and December 31.

[2]The uncovered rough concrete hallway floors occupy a pivotal role in the state of readiness of the apartments. Rough concrete produces a fine dust which adheres to the bottoms of shoes. Workmen would track this dust to all corners of the apartments in the process of installing fixtures and other items described in the text. Given the limited area covered by plastic runners and the low absorption capacity of newspapers, carpeting could not be laid until the workmen had finished. Furniture could not be placed in the apartments before the carpeting was laid. In any event, the noise and commotion generated by the installation of sinks, cabinets, vanitorials, etc. would have rendered the apartments untenantable.

On or about December 1, 1975–and not before–approximately 15 apartments were ready for occupancy. All that remained was the installation of carpeting on the floor of each apartment. (Choice of carpeting was left to the tenant). Nine apartments, located on the first five floors, were occupied by their tenants between December 1 and December 5, 1975. These were the initial occupants of the building. Their occupancy was in violation of the Passaic Building Code, as the required Certificates of Occupancy had not been issued.

On December 4, 1975 those 9 tenants were directed by the Passaic Building Inspector to vacate their apartments immediately, a determination having been made that the building was unsafe and hazardous to life and limb. Specifically, inspection revealed eleven deficiencies, all related to fire protection and the safety of the building's occupants. The most critical defect was the failure of the fire pump to withstand a hydrostatic pressure test. In that testing the stand pipe main intended to service all floors of the building ruptured, thus leaving the building totally devoid of fire protection.

The sole issue in this case is whether the subject property was substantially ready for its intended use at any time prior to December 1, 1975 within the contemplation of *N.J.S.A.* 54:4–63.-1. The statute has received little judicial attention since its passage almost 29 years ago. It would appear that the only reported case in which its provisions have been construed is *Texas Eastern Transmission Corp. v. East Amwell Tp.*, 82 *N.J. Super.* 593, 198 *A.2d* 786 (App.Div.1964), wherein the Court was called upon to decide the state of completion of an interstate natural gas pipeline for added assessment purposes. That case provides no edifying analogy in aid of decision in the case *sub judice.*

The issue is not a novel one in New York, however. There the courts have construed legislation permitting tax assessment of newly erected structures only with reference to a date by which those structures were "ready for occupancy". The New York Supreme Court, Appellate Division, has held that

the underlying test is whether construction has reached the point where an economically viable structure is in existence as of the critical cut–off date; and the failure to qualify for a certificate of occupancy will not *per se* render the building not ready for occupancy for tax assessment purposes. *Oakwood in Forest Hills, Inc. v. Tax Commission*, 30 *A.D.*2d 863, 293 *N.Y. S.*2d 58 (App.Div.1968), aff'd. *o.b.* 23 *N.Y.*2d 949, 298 *N.Y.S.*2d 729, 246 *N.E.*2d 530 (Ct.App.1969). The New York Court of Appeals applied the same economic viability test in construing earlier legislation dealing with readiness for occupancy for tax assessment purposes. *People ex rel. 176 West 87th St. Corporation v. Cantor*, 230 *N.Y.* 312, 130 *N.E.* 305 (Ct.App.1921).

I find the principles adopted by the New York courts eminently sound, as they result in a construction of the relevant taxing statute which accords with economic and fiscal reality. Although an incomplete building is subject to a partial assessment on October 1 for the ensuing tax year, *Appeal of N.Y. State Realty & Terminal Co.*, 21 *N.J.* 90, 121 *A.*2d 21 (1956), the added assessment statutes permit, in effect, an acceleration of assessment during the tax year (as well as a pro rata assessment during the post–October 1 portion of the pretax year) to coincide with the point at which the assessed improvements impose their maximum burden on municipal services. That point is reached, in the case of a high–rise apartment building, when the structure is ready to receive its tenants, whose residence within the boundaries of the taxing district requires police and fire protection, sanitation facilities and other governmental services. By the same token rental income from the finished structure provides the wherewithal to pay for the required municipal services through taxes.

In like manner, there is merit to the New York courts' view that qualification of a building for a certificate of occupancy is not *per se* determinative of the building's readiness for occupancy within the meaning of the taxing statute, and that failure to qualify for a certificate of occupancy is only one of several circumstances to be considered. This pragmatic approach is reflected in a New Jersey statute passed during the pretax year

under review in the instant case. *N.J.S.A.* 52:27D–133 (part of the State Uniform Construction Code Act enacted on October 7, 1975) provides that no building may be used or occupied prior to issuance of a certificate of occupancy, which may only be given when all the work covered by a construction permit shall have been properly completed. The statute goes on, however, to permit the issuance of a temporary certificate of occupancy prior to completion of the work covered by the construction permit if the building (or affected parts thereof) may be occupied without endangering the health and safety of the occupants. While the effective date of the Uniform Construction Code Act, *N.J.S.A.* 52:27D–119 *et seq.*, was subsequent to the taxable period under review, the statute revealed a legislative attitude consistent with the realistic view of the New York courts concerning the import of a certificate of occupancy for tax assessment purposes. See *Bayonne v. Port Jersey Corporation*, 79 *N.J.* 367, 380, 399 *A.*2d 649 (1979).

In applying the foregoing principles to the facts of the instant case, I find that the subject property was not an economically viable unit on December 1, 1975, as only 15 apartments out of a projected 120 rental units were habitable on that date. Of those 15, only 9 units were actually occupied by their tenants between December 1, and December 5, 1975.

Furthermore, on December 4, 1975, the Passaic Building Inspector ordered those 9 apartments vacated immediately on the ground that the building was unsafe and hazardous to life and limb. Inspection had revealed eleven deficiencies, all related to fire protection and the safety of the building's occupants. While, as indicated above, the failure of the building to qualify for a certificate of occupancy is not dispositive of the issue of whether the structure was substantially ready for its intended use within the meaning of *N.J.S.A.* 54:4–63.1, it is clear that the building could not be occupied without endangering the health and safety of its occupants until some time after December 1, 1975, the critical cut–off date for the validity of any added assessment for 1975. This circumstance alone, independent of

the question of the building's economic viability, forecloses a conclusion that the building was substantially ready for its intended use before December 1, 1975. Accordingly, the added assessment for the last three months of 1975 is invalid in its entirety. *N.J.S.A.* 54:4–63.2.

Judgment will be entered in accordance with this opinion.