LASSER, P.J.T.C.
Taxpayer contests real property tax assessments on its office building property located on American Road, Morris Plains, Morris County, New Jersey, known as Block 11, Lot 3. At issue are the 1983 added assessment and the 1984 assessment. The pertinent assessments are as follows:
1983 Initial Assessment 1983 Added Assessment on Improvements 1984 Assessment
Land $ 1,412,100 $ 1,412,100
Improvements 8,903,000 $15,500,000 (12 months) 24,403,000
Total S 10,315,100 $11,625,000 (prorated for 9 months) $25,815,100
*522 The 1983 added assessment was affirmed by the Morris County Board of Taxation, and an appeal from the county tax board’s judgment was taken to the Tax Court. The 1984 assessment was the subject of direct complaints to the Tax Court, pursuant to N.J.S.A. 54:3-21, filed on August 15, 1984 by the taxpayer, which sought a reduction, and by the taxing district, which sought an increase, in the assessment.
The parties have stipulated that (1) a municipal-wide revaluation at 100% of true value was adopted in Morris Plains for the year 1983 and (2) the land value is $50,000 an acre.
The subject property is a complex of three, steel frame and masonry, two-story office buildings located on a 28.242-acre parcel of land. The property was used as the worldwide corporate headquarters of the Monroe Division of Litton Industries.[1] The property, zoned “Limited Industrial,” is located at the end of a cul-de-sac in a corporate campus setting and is close to major highways (Routes 287, 10, 80 and 46), but access to American Road from Hanover Avenue is made difficult by the traffic pattern and the absence of a traffic signal. There are no other office buildings in the immediate area. All utilities are at the site. There is adequate paved parking on the subject property for the three buildings in single-tenant use, but the number and location of the parking spaces may be inadequate for multi-tenant use.
The buildings, denominated A, B and C, are joined by connecting, enclosed two-story passageways.[2] The dates of construction and sizes of the buildings are as follows:
*523 Building A - built 1983 (Taxpayer contends that this building was not completed in 1983)
First floor 41,796 sq. ft.
Second floor 41,796 sq. ft.
No basement -
Total area 83,592 sq. ft.
Building B - built 1983 (Taxpayer concedes that this building was completed by March 31, 1983)
First floor 26.260 sq. ft.
Second floor 26.260 sq. ft.
Finished basement area 19,540
Unfinished basement area 1,600
Total basement area 21,140 sq. ft.
Total area 73,660 sq. ft.
Building C - built 1975
First floor 54.600 sq. ft.
Second floor 54.600 sq. ft.
Unfinished basement area 27,300
Semi-finished basement area 27,300
Total basement 54,600 sq. ft.
Total area 163,800 sq. ft.
Total area - three buildings
Office space (including 8,000 sq. ft. of connecting, enclosed passageways) 253,312 sq. ft.
Finished basement area 19,540
Semi-finished basement area 27,300
Unfinished basement area 28,900
Total basement area 75,740 sq. ft.
Total area 329,052 sq. ft.
I find from the testimony that the foregoing square foot figures are the correct figures, although those used by the appraisal experts in their calculations vary with regard to some items. In comparing the value opinions of the experts, I will use a total rentable area of 273,000 square feet (total of upper floors, passageways and finished basement = 272,852 square feet).
The buildings were designed for a single user, with perimeter private offices and substantial open office landscaping without permanent partitions. Building C has two elevators, and buildings A and B each have one elevator. The buildings are heated, *524 air-conditioned and sprinklered, and are similar except that the heating, ventilating and air-conditioning (HVAC) system in building C differs from those in buildings A and B. Buildings A and C each have a lobby, but the lobby in building A is not completed.
Taxpayer’s senior project manager, a registered architect who was in charge of the construction of buildings A and B, testified that the total cost of construction of these two buildings was $10,304,022, of which $9,340,674 was paid under the February 1982 contract to E.W. Howell & Co., the general contractor, and the balance was attributable to time spent by Litton employees, materials purchased directly by Litton and miscellaneous expenses. Not included in the $10,304,022 cost were in-house design, legal fees, site improvement and variance application costs, financing expense and taxes during construction and the contractor’s overhead and profit on Litton-purchased materials. The witness testified that $346,048 included in the construction cost was for the cutting of holes in the wall and roof of building C and the moving of utilities to accept the two-story, enclosed passageways to connect building C with buildings A and B, and was not attributable to the cost of constructing buildings A and B.
With respect to construction completion dates for buildings A and B, this witness testified that the temporary certificate of occupancy for both buildings was issued on March 18, 1983. On this date the shell of building A had been completed, the floor was bare concrete and the interior of the exterior walls had been covered with gypsum board with one primary coat of paint. The HVAC system was able to heat and cool to a minimal degree, the plumbing was complete, the elevator was operable, the electricity had been brought to junction points in the ceiling and most of the hung ceiling had been installed. In March 1983 it was still necessary in building A to complete the interior finish, install carpeting and partitions, complete the electrical installation, including the lighting fixtures, install the sprinkler heads and add ducts and diffusers to the HVAC system.
*525 Although building A was designed for open office planning, the stage of completion in April 1983 was such that there were no partitions except for the bathrooms. All interior finish for .occupants’ use was yet to be done.
I.

Taxpayer’s Appraisal Expert’s Opinion of Value.

The appraisal expert for the taxpayer relied principally on the cost approach because, he stated, the recent construction of buildings A and B made this approach more reliable. This expert’s building cost was derived from the Marshall Valuation Service Manual. He concluded that the cost approach value as of October 1, 1983 is:
253,312 square feel of office area and passageways at $59.12 a square foot $14,975,800 (rounded)
21,125 square feet of finished basement - bldg. B at $32.85 a square foot 694.000 (rounded)
54,600 square feet of unfinished basement - bldg. C at $14.17 a square foot 773,700 (rounded)
Added for semi-finished basement in bldg. C 327.000
Added for HVAC cost adjustment 518,800
Site improvements 500.000
Total cost new $17,789,300
Less unfinished area of bldg. A - 1,576,500 [3]
[3]
Less depreciation of bldg. C - 1,042,500
Total improvements value $15,170,300
Add land value 1,412,100
Total property value $16,582,400
He testified that the actual cost for buildings A and B, including passageways to building C, amounted to $60.26 a square *526 foot ($9,957,974[4] h- 165,237 square feet), which is close to the $59.89 a square foot cost new for the total improvements found from the Marshall Valuation Service Manual ($15,170,300 -f-253,312 square feet).
Taxpayer’s expert testified that building A was not completed in 1983, and therefore he was of the opinion that no added assessment should be imposed on building A for 1983. This expert’s total value of the property on April 1, 1983, excluding building A, is:
Building B $ 3,934,600
Building C 6,728,800
Site improvements 400,000
Land value 1,412,100
Total $12,475,500
It was the opinion of this witness that the 1983 added assessment should be $12,475,500 minus the 1983 initial assessment of $10,315,100, or $2,160,400 which, when prorated for nine months, becomes $1,620,300.
Taxpayer’s expert testified, in the alternative, that if building A had been completed by April 1, 1983, as the taxing district contends, the total value for all three buildings on April 1, 1983 would be $16,582,400, the 12-month added assessment would be $6,267,300 ($16,582,400 less $10,315,100), and prorated for nine months would be $4,700,500 (rounded).
This expert testified that the income approach is less probative in ascertaining the value of the subject because it is a single-user property that has never been rented to others. It was his opinion that the design and layout of the subject is not suitable for multi-tenant use because of insufficient lobby areas, the location of elevators and security problems caused by the requirement that doors in the passageways between buildings A, B and C be kept unlocked. He opined that there was a substantial adjustment required (15-25%) because the subject’s location is inferior to that of other office buildings in the area. From his examination of 16 North Jersey office building leases *527 (with principal reliance on the first seven, which are all single-occupancy buildings), the expert concluded that the subject would rent for $12.50 a square foot. Using this figure he arrived at the following income approach value:
274,437 square feet at $12.50 $3,430,463
Vacancy and credit loss at 5% -171,523 (rounded)
Effective gross income $3,258,940
Expenses
Management at 3% 97.768 (rounded)
Reserves at 3% 97.768
Commission at 3% 97.768
Miscellaneous at 1% 32,589
- 325,893
Net income before capital requirements $2,933,047
Less return to land $1,412,100 at 12.5% -176,513 (rounded)
Net to buildings $2,756,534
Capitalized at 14.5% $19,010,579
Add land 1,412,100
$20,422,679
Less cost to complete bldg. A -1,576,500
Total property value $18,846,200 (rounded)
This expert’s capitalization rate consisted of:
Risk rate 12.50%
Return rate 2.00%
Total 14.50%
From his correlation of the cost and income approaches to value, taxpayer’s expert concluded that the cost approach value of $16,582,400 should prevail, and that little or no weight should be given to the income approach, and it was his opinion that his cost approach conclusion represented the value of the subject as of October 1, 1983.
II.

Taxing District’s Appraisal Expert’s Opinion of Value.

The expert for the taxing district testified that the subject property is located in a good suburban office area with adequate access and adequate parking. He testified that there is *528 access to the parking lots from the rear of the buildings, and there is room for additional parking spaces if needed. With respect to the state of completion of building A, he testified that the building was substantially completed, although there was no floor covering, demising walls or electricity in the walls, the hung ceiling had been installed but some ceiling tiles were missing and some lighting fixtures had not been installed. He ■ stated that the heating and air-conditioning ducts had not been installed, as their installation would depend on the location of the walls to be erected. He said that it is typical to leave an office building at this stage of completion until the property is leased and the tenant has determined what interior finish is required.
The taxing district’s expert valued the property by use of the cost, market and income approaches. His cost approach was derived from the Marshall and Swift computerized cost program, while taxpayer’s expert used the Marshall and Swift printed manual. Like the expert for taxpayer, this expert’s cost was computed for a class C office building having a quality cost rank of 4.5 in a range of 1 to 5, with 5 being excellent.[5] This expert’s October 1, 1982[6] cost approach conclusions follow:
Building A
83,592 sq. ft. at $89.02/sq. ft. $7,441,285
Less cost to complete at $12/ sn ft -1,000,000 (rounded)
$6,441,000 (rounded)
*529 [[Image here]]
In his market data approach the taxing district’s expert relied on a comparison of sales of seven office buildings, only one of which was a single-occupancy building. These sales ranged in date from March 1981 to February 1984 and in building size from 55,400 square feet to 154,088 square feet, on land ranging in size from 4.5 to 42 acres, located in Florham Park, Parsippany, Hanover, Morris Township and Berkeley Heights. These properties sold for square foot prices ranging from $85.64 to $107.95. When adjusted by the expert for time, location, land size and physical characteristics, these sales indicated a value for the subject property of from $93 to $109 a square foot. From these sales the expert concluded that 264,312 square feet of the subject property should be valued at $100 a square foot or a total of $26,431,200, rounded to $26,400,000[7], but stated *530 that there must be deducted from this figure an allowance of $1,000,000 for the cost to complete building A.
The taxing district’s expert’s income approach value utilized an October 1, 1982 economic rent of $19 a square foot and an October 1, 1983 economic rent of $21 a square foot of finished office space, with lower figures for unfinished office and basement space. These rental figures were derived from 12 leases, nine of which were for single-occupancy buildings. The 12 leases were entered into between 1982 and 1984, at square foot rentals ranging from $15.03 net to $20 gross, and were for office building space in Morris Township, Bernards Township, Parsippany, Livingston, West Paterson, Saddle Brook and Berkeley Heights. Adjustments for time, location, physical condition and expenses required to be paid by the landlord resulted in an indicated square foot gross rental for the subject ranging from $15.20 to $20.24. Based on these conclusions as to economic rent, this expert calculated the value by the income approach as follows:
October 1, 1982 October 1, 1983
Building A 83,592 sq. ft. ($17.50/sq.ft) $ 1,462,860 ($19/sq.ft.) $ 1,588,250
Building B 52,520 sq. ft. ($19/sq.ft.) 997,880 ($21/sq.ft.) 1,102,900
Building B basement 19,000 sq. ft.[8] ($13/sq.ft.) 247,000 ($14/sq.ft.) 266,000
Building C 109,200 sq. ft. ($19/sq.ft.) 2,074,800 ($21/sq.ft.) 2,293,200
$ 4,782,540 $ 5,250,350
Less vacancy allowance (4%) - 191,302 (10%) - 525,035
Effective Gross Income $ 4,591,238 $ 4,725,315
Expenses October 1, 1982 October 1, 1983
Insurance 26,650 29,000
Management 186.500 190.100
Heat 266.500 293.100
Electric 53.300 58,600
Water 13.300 13,300
*531 [[Image here]]
III.

October 1, 1983 Value.

In the valuation of real property it is desirable to utilize all three approaches to value if applicable. Each approach may have its shortcomings, but since value, which is a matter of opinion, is often elusive, it is helpful to have as many checks as possible on an expert’s opinion and reasoning in arriving at that opinion, in order to satisfy the court of the soundness cf that opinion. In this case taxpayer’s expert utilized the cost and income approaches to value. He then rejected the income approach, stating that his rental value was too high. He relied solely on the cost approach because buildings A and B were newly constructed and the cost figures were readily available.
The problem in relying solely on the cost approach is demonstrated by the variance in the cost approach values of the two experts. Taxpayer’s expert’s cost approach value of improve *532 ments as of October 1, 1983 is $16,746,800,[9] and the taxing district’s expert’s is $24,657,000[10] as of October 1, 1982, and based on the testimony, would be approximately 10% higher on October 1, 1983. Both experts used the Marshall Valuation Service for the cost of a class C office building having a cost rank of 4.5. Taxpayer’s expert’s construction cost as of October 1, 1983 was $61.34 a square foot, before deducting the cost to complete building A. The taxing district’s expert’s cost as of October 1, 1982 amounts to $90.32 a square foot which, when increased by 10% to October 1, 1983, amounts to $99.35 a square foot.[11] Taxpayer’s expert relied on the actual cost of buildings A and B to check the accuracy of his Marshall Valuation Service figures. However, the actual cost figures testified to by taxpayer’s expert did not include the substantial costs that would be charged to a user by an independent contractor for planning, designing, financing and constructing the buildings for sale in an arm’s length transaction. For this reason, taxpayer’s expert’s cost figures are lower than an independent contractor’s cost to build. This conclusion is supported by taxpayer’s expert’s income approach value, which is more than $2,000,000 higher than his cost approach value.
Taxpayer argues that the actual cost of buildings A and B, when applied to the entire property, represents the value of the property under the principle of substitution. This principle holds that a building will not be purchased in the market for more than it would cost to acquire an equally desirable substitute property. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed.1983) at 24. Taxpayer argues that there was land available in the area on which *533 buildings A, B and C could have been reproduced, that the cost approach represents the upper limit of value because that is the cost of acquiring a substitute property and therefore the actual cost as applied to the entire property represents its value. Taxpayer concedes that there must be added to the actual cost of construction the “soft costs,” including the cost of delay in use caused by the one year to 18 months that would be required to build the substitute building. The taxing district adds that entrepreneurial profit, the compensation to the builder-developer for his time, energy and initiative (sweat equity), must be added to the cost, and that the entrepreneurial profit is the difference between the price that the property would sell for in the market and the actual cost of construction. An appraisal expert’s cost approach value is not necessarily the upper limit of value when the market and income approaches indicate a higher value. Whether the cost approach value is the upper limit of value and whether entrepreneurial profit is to be added to actual cost depends on the value indicated by valid and reliable market and income approaches.
Considerable testimony was presented concerning the quality of the subject buildings and the square-foot construction cost attributable to a good quality building as compared to an excellent quality building. I find that the subject property is not physically superior to the single-occupancy properties used as comparable rentals and sales because structural construction items, such as the metal door frames, the average quality unsealed vinyl tile and the use of fiberboard instead of concrete block as backing for exterior masonry, remove it from the excellent category.
I conclude that the quality of the subject property is very good but not excellent, and although used as a corporate headquarters, the subject buildings are more modest and not of the quality described in CPC International, Inc. v. Englewood Cliffs, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984). Therefore the CPC analysis is not appropriate here. The subject property is comparable to a good quality, single-occupancy office building. From my analysis of the cost approach testi *534 mony of the experts, I find that $85 is representative of the square-foot cost of the improvements constructed on the subject property as of October 1, 1983, based on 273,000 square feet of rentable area. This would yield a value for the improvements of $23,205,000 which, when added to the land value of $1,412,100, totals by the cost approach $24,617,100, or $23,617,-100 after subtracting the $1,000,000 cost to complete building A.
The subject property, built as a corporate headquarters office building, is not so special purpose or unique that it cannot be compared with similar single-occupancy office buildings in the area. Multi-tenanted buildings are not comparable because of physical differences. These physical differences include the absence of a lobby in building B, the single elevators in buildings A and B and the poor location of the elevators in all three buildings. Also included in this category are the unlocked passageways between the buildings, the limited visibility and limited ingress and egress.
There is a sale and rental market for single-occupancy office buildings in the Morris Plains area. It is therefore not necessary to rely solely on the cost approach, particularly when use of the cost approach alone leaves unresolved questions concerning entrepreneurial profit and actual costs that were not included, relating to planning, design, financing and carrying cost during construction.
Taxpayer’s expert did not analyze sales of office buildings in the area. The taxing district’s expert performed a market approach analysis and concluded from an examination of sales of seven office buildings in the area that the subject property would sell for $96.70 a square foot,[12] before deducting the cost to complete building A. The only sale of a single-occupancy office building was sale no. 6. In adjusting this sale, the expert increased the sale price by 125% because it was his opinion that the subject building was physically superior. The sale no. 6 *535 building was built in 1970. The subject was built part in 1975 and part in 1983. Although I find that the subject is not physically superior, an adjustment must be made for the difference in age of the buildings, and I estimate this adjustment to be 5%. After adjustments, sale no. 6 indicates a value for the subject (land and buildings) of $89.03 a square foot as of October 1, 1983.[13]
In his income approach, taxpayer’s expert testified to a $12.50 a square foot rental value of the subject property as of October 1,1983, and the taxing district’s expert opined that the rental value as of October 1, 1983 is $19.23 a square foot ($5,250,350 -b 273,000 square feet). I note that taxpayer’s expert’s $12.50 a square foot becomes $10.69 a square foot net after deducting 5% vacancy and 10% expenses, and the taxing district’s expert’s net income before local property tax is $13.42 a square foot ($3,664,515 -h 273,000 square feet) and after deducting local property tax would be $12 or less. I have considered the taxing district’s expert’s nine leases of single-occupancy buildings and the single-occupancy leases used by taxpayer’s expert, and have also considered the adjustments to be made for time, location, physical quality and size of the rental area and the incentives given to tenants to induce them to enter into leases, and conclude that $12.50 a square foot is the fair rental value of the subject property in the condition in which it existed on the October 1, 1983 assessing date, suitable only for single-occupancy use.
I accept the expenses of taxpayer’s expert, the 5% vacancy rate used by both experts, and the capitalization rate used by the taxing district’s expert. I utilize an overall capitalization rate rather than a building residual method because the overall rate is more reflective of the market. In accepting taxpayer’s expert’s rental value, I accept his opinion that a tenant would *536 pay the local property tax. Therefore, my capitalization rate does not include a factor for such tax. I calculate the October 1, 1983 value by the income approach as follows:
Rental value
(273,000 sq.ft. X $12.50/sq.ft. $ 3,412,500
Less vacancy (5%) — 170,625
$ 3,241,875
Expenses
Management 3%
Reserves 3%
Commission 3%
Miscellaneous 1%
Total - 324,188
Net income $ 2,917,687
Capitalized at 12 07% $24,173,048
Allocated
Land $ 1,412,100
Improvements 22,760,948
Total $24,173,048
Less cost to complete building A -1,000,000
Total October 1, 1983 value by the income approach $23,173,000 (rounded)
I find the value of the land and improvements before deducting the cost to complete building A to be $90.17 a square foot by the cost approach ($85 a square foot for improvements, to which is added the land value), $88.55 a square foot by the income approach and $89.03 a square foot by the market approach. My conclusions of value from the income and market approaches show that there is no separate increment in value for entrepreneurial profit. Although the values by the three approaches are similar, I adopt the cost approach value and conclude that the value of the subject property as of October 1, 1983 is:
*537 Land $ 1,412,100
Improvements 22,205,000[14]
Total $23,617,100

IV.

1983 Added Assessment.

The 1983 initial assessment for improvements is $8,903,000. This assessment, which represents the value of the improvements as they existed on October 1, 1982, is not in issue. The 1983 added assessment of $15,500,000 valued additions to buildings A and B that were completed between October 2, 1982 and April 1, 1983. This value was prorated for nine months of 1983 beginning April 1, 1983 at 75% of this figure, or $11,625,000.
The statutes which provide for an added assessment on property completed after October 1 of the pretax year are N.J.S.A. 54:4-63.1 to -63.11. Section 63.1 defines “completed” as “substantially ready for the use for which it was intended.” The interpretation of these words was dealt with in Beranto Towers v. Passaic, 1 N.J.Tax 344 (Tax Ct.1980). In that case, Judge Crabtree held that the determining factor for an added assessment is “whether construction has reached the point where an economically viable structure is in existence as of the critical cut-off date____” Id. at 349. In the Beranto case the court dealt with a high-rise apartment building and held that the building was not an economically viable unit when, of a projected 120 units, only 15 apartments were habitable, nine of which were actually occupied and the building inspector ordered these nine apartments vacated on the ground that the building was unsafe. Id. at 350.
Buildings A and B were not built as speculative office buildings or for investment. They were built by the owner for its own use as a corporate headquarters for its Monroe Systems Division. Building B was completed and partly occupied. Building A was not completed, probably because of the efforts by Litton to sell its Monroe Systems Division. It is clear that building A could not be used as a corporate headquarters in *538 March 1983 because building A was not completed or even substantially completed at that time.
In the subject case a temporary certificate of occupancy was issued for buildings A and B on March 18, 1983. N.J.S.A. 52:27D-133 provides that a temporary certificate of occupancy may be issued prior to completion of the work if the building (or affected parts thereof) may be occupied without endangering the health and safety of the occupants. The issuance of a temporary certificate of occupancy does not in itself establish substantial completion. See Beranto Towers, supra, 1 N.J. Tax at 350.
The statute creates a functional test which must be applied to the use of the building. Building A was constructed for use as a corporate headquarters and on April 1, 1983 could not be put to that use. The taxing district’s argument that building A should be regarded as if it were a speculative shell building is irrelevant. The test is whether the building could be used for its intended use on April 1, 1983, and it is obvious that building A could not.
I note that the added assessment procedure is only an interim measure. The taxing district had the opportunity to assess building A as it existed on October 1, 1982 and again as it existed on October 1, 1983. Denying the taxing district the opportunity to assess building A on April 1, 1983 does not unduly disturb the municipal fisc.
 I conclude that the imposition of a 1983 added assessment on building A is not authorized under the added assessment statute because the building was not substantially completed for its intended use in 1983. Therefore, the portion of the added assessment that relates to building A must be deleted.
To determine the appropriate 1983 added assessment, I must deduct the value of building A from the value of the entire property as of April 1, 1983, and from the result, subtract the initial 1983 assessment. This method, which was used by both *539 experts, assumes that the initial 1983 assessment does not include a partial assessment on building A, and there was no evidence presented that it does.
I have determined above that the total improvements value as of October 1, 1983 is $85[15] a square foot by use of the cost approach. Adjusting back in time to April 1,1983 at the rate of 10% a year, or 5% for six months, reduces the improvements value to approximately $80.75 a square foot and results in an improvements value for the entire property as of April 1, 1983 of $21,044,750 ($80.75 a square foot X 273,000 square feet, less $1,000,000 cost to complete building A) and $5,750,054 for building A (83,592 square feet X $80.75 a square foot, less $1,000,000 cost to complete). The appropriate 1983 added assessment is thus calculated as follows:
Total improvements value as of April 1, 1983 $21,044,750
Less value of building A —5,750,054
April 1, 1983 value of improvements without building A $15,294,696
Less 1983 initial assessment on improvements —8,903,000
Added assessment on improvements $ 6,391,696
Prorated for nine months $ 4,793,772

Conclusion.

Based on the foregoing, the Clerk of the Tax Court is directed to enter judgment reducing the 1983 added assessment to $6,391,696, prorated for nine months to $4,793,772, and reducing the 1984 assessment to:
Land $ 1,412,100
Improvements 22,205,000
Total $23,617,100
Since both the average ratio and the ratio of assessed value of the subject property to its true value exceed the county percentage level (100%), the proper 1984 assessment pursuant *540 to N.J.S.A. 54:51A-6 is 100% of the true value of the property. This statute is not applicable to the 1983 added assessment because 1983 is a revaluation year.

 The subject property was sold on January 8, 1985 by Litton Business Systems, Inc. to PMW Partnership as part of a leveraged buyout of the Monroe Division. Because the real property was sold in connection with the sale of the business, this sale is not regarded by either party as reflective of market value.

 The real estate representative for Litton testified in a March 6, 1985 deposition that building A had not been occupied or offered for lease or sale and building B was left partly vacant for Monroe’s internal reasons.

 Taxpayer’s appraisal expert estimated that the cost to complete the interior finish of building A would be approximately 30%-32% of the building’s total cost, and he estimated this cost-to-complete at $1,576,500 (rounded), based on his October 1, 1983 estimate of the cost of floor covering, partitions and electrical work of $18.86 a square foot (83,592 square feet x $18.86 a square foot = $1,576,545).

 $10,304,022 less the $346,048 cost of work done on building C.

 In response to questions put to the taxing district's expert with respect to the difference between the computer program and the printed manual, this expert related that he had spoken with a representative of Marshall and Swift and was told that the computerized rank of 4.5 "represents the interpolation between the Class B excellent and the Class C excellent____” It appears that taxpayer's use of the 4.5 ranking in the printed manual is only an interpolation between grades within class C.

 The taxing district’s expert did not testify to an October 1, 1983 value by the market or cost approach.

 $96.70 a square foot based on 273,000 square feet of rentable area.

 This expert's adjustment for actual area of finished basement.

 $ 15,170,300 improvements value plus $1,576,500 cost to complete building A.

 $25,069,100 less $1,412,100 land value, plus $1,000,000 deducted by the expert for completion of building A.

 The experts used different square foot figures for different purposes. In order to deal consistently with these figures, I have converted them based on 273,000 square feet of rentable area.

 See n. 6, supra.

 Sale no. 6 unadjusted square foot price of $105.56 X time adjustment of 1.05 X location adjustment of .90 X excess land adjustment of .85 x age of building adjustment of 1.05 = $89.03.

 $85 a square foot x 273,000 square feet, less $1,000,000 cost to complete building A.

 $23,205,000 improvements value before deducting the $1,000,000 cost to complete building A ~ 273,000 square feet = $85 a square foot.