**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

November 2, 2023

Michael A. Rienzi, Esq.
Brach Eichler, LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068

Joseph Sordillo, Esq.
DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

> Re:  Leabern Realty, L.P. % Wayne v. Montclair Township
>       Docket Nos. 000166-2020 and 007681-2020

Dear Mr. Rienzi and Mr. Sordillo,

This shall constitute the court's opinion following trial in the above matters. Leabern Realty, L.P. ("plaintiff") challenges the 2019 tax year nine-month prorated added assessment imposed by Montclair Township ("defendant"), and the 2020 tax year assessment on plaintiff's property. At issue is the date when repairs to the property should be deemed "completed" for purposes of imposing an added assessment under N.J.S.A. 54:4-63.3.

For the reasons stated below, the court finds that defendant's 2019 tax year nine-month prorated added assessment was reasonable and supported by the evidence. In addition, the court finds no basis for reducing the property's 2020 tax year assessment. Accordingly, the court affirms the 2019 tax year nine-month prorated added assessment and affirms the 2020 tax year assessment.

## I.  Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following factual findings based on the evidence and testimony offered during trial.

As of all dates herein, plaintiff was the owner of the real property and improvements

located at 192 Claremont Avenue, Montclair Township, Essex County, New Jersey.  The property is identified on defendant's municipal tax map as Block 3201, Lot 15 (the "subject property"). The subject property's lot comprises approximately 0.3283 acres.

The subject property is improved with a four-story brick, pre-war, 28-unit residential apartment complex.  The complex does not have on-site parking.

In or about late July 2015, the building experienced a significant fire.  According to one of plaintiff's partners, the fire "totally decimated" two of the seven apartment lines in the building. Moreover, during the efforts to contain and extinguish the fire, several interior walls were broken through, holes were cut into the roof, holes were cut into the floor, exploratory holes were cut into interior walls, and exterior windows were broken.  The smoke damage from the fire permeated the entire building.  In addition, the building's basement, where the building systems were located, experienced extensive water damage.

On or about July 28, 2015, defendant issued plaintiff a "Notice of Unsafe Structure" due to the extensive fire damage.  Following the fire, defendant's municipal tax assessor reduced the subject property's improvement assessment to approximately $250,000 for the 2016, 2017, and 2018 tax years.

In March 2016, plaintiff retained a property restoration firm to commence repairs to the subject property.  In total, eighty-four construction permits were sought to effectuate repairs to the subject property.[1]  The work undertaken by the property restoration firm included demolition, fire cleaning, structural repairs, construction repairs/replacements (electrical, plumbing, framing, fire-proof insulation, drywall, and painting), exterior brick repointing, updating the building to satisfy

---

[1]  Nine of these permits were apparently applications for Certificates of Occupancy.




current building code requirements (hardwiring smoke detectors, installation of carbon monoxide detectors, etc.), and window repairs/replacements. However, because the smoke damage impacted the entire building, plaintiff also used this as an opportunity to renovate and upgrade all apartment units, including the installation of new kitchens, bathrooms, and flooring.

In addition to contracting with the property restoration firm, plaintiff retained separate contractors to undertake replacement of the subject property's elevator and the subject property's boiler.

According to the property restoration company's representative, it "substantially complete[d]" the initial phase of the repair work identified under their contract with plaintiff in or about January 15, 2018. The representative testified that the term "substantially complete" is defined under their contract as "the stage and progress of the work where the work or designated portion of the work is sufficiently complete in accordance with the contract documents so that [the] owner can utilize the work area for its intended use."

However, the property restoration company continued to make repairs to the subject property identified under punchlists bearing the following dates: (i) January 20, 2018; (ii) March 24, 2018; (iii) November 30, 2018; (iv) December 6, 2018; and (v) March 12, 2019.[2] The punchlists required the property restoration company to address numerous issues (cleaning, paint touch up, removing plastic from appliances, hardware repairs, etc.), repairs to vinyl flooring that suffered from an apparent manufacturing defect, and repairs to the exterior windows which either did not open, or once opened would not stay open. During trial, the property restoration company's representative detailed the bubbling that occurred with the newly installed vinyl flooring and the

---

[2] Copies of the punchlists were not offered during trial.






various mechanisms that needed to be replaced and recounted the difficulty encountered in obtaining and installing replacement parts for more than forty windows.[3]

Between January and March 2018, defendant's Construction Code Division issued Certificates of Approval, reciting that the permitted work is "completed [and] has been constructed or installed in accordance with the New Jersey Uniform Construction Code and is approved."

In addition, on January 26, 2018, defendant's Construction Code Division issued Certificates of Occupancy for the following areas: (i) "common areas & basement repairs"; (ii) "repair of fire-damaged Apt. #1-new bathroom fixtures and new kitchen cabinets"; (iii) "repair of fire-damaged Apt. #2"; (iv) "repair fire-damaged Apt. #21-new bathroom fixtures, new kitchen cabinets"; (v) "repair of fire damaged Unit #22, new vinyl windows, insulation, drywall, plumbing fixture, lightin[g] fixtures, kitchen cabinetws [sic] and floors"; (vi) "repair fire-damaged Apt. #31-new plumbing fixtures, new kitchen cabinets"; (vii) "repair of fire-damaged Unit #32-replace damaged windows, insulation, drywall, new plumbing fixtures, new kitchen cabinets and floors"; (viii) "repair fire damaged Apt. #41"; and (ix) "repair of fire damaged Apt. #42."

In or about December 2018, defendant's housing inspector inspected the subject property and issued Certificates of Habitability for several apartments.[4] [5]  In addition, in or about March

---

[3]  According to one of plaintiff's partners, "many of the kitchen floors . . . were bubbling and the bubbling . . . was significant enough for us to not want to show apartments with big bubbles in the middle of the floor, so that delayed our proceeding with leasing of the property."

[4]  Under § 213-10 of defendant's building code, "[i]t shall be unlawful for any property owner . . . to rent or lease and deliver up for human occupancy any dwelling unit until a certificate of habitability shall have been issued by the Housing Officer indicating that such dwelling unit is not in violation of the Housing, Building, Fire or Health Codes of the Township of Montclair. . . ." Montclair Township Building Codes, Chapter 213 Multifamily Buildings, No. 80-12 (adopted April 15, 1980).

[5]  Defendant's housing inspector issued thirteen Certificates of Habitability dated December 27, 2018.






2019, defendant's housing inspector re-inspected the subject property and issued Certificates of Habitability for several additional apartments.[6]  Although he could not recall the dates when the inspections were performed, plaintiff's property manager credibly testified that he was present during each of the Certificate of Habitability inspections.[7]

In or about April 2019, the property restoration company and plaintiff agreed to a credit against the balance due in exchange for which plaintiff would complete the remaining punchlist items.  Thereafter, plaintiff's building, plumbing, and electrical contractors completed the remaining punchlist items.[8]

On or about June 8, 2019, plaintiff signed an Exclusive Right to Rent/Lease Agreement with Keller Williams Realty to begin marketing the subject property for lease.  According to plaintiff's property manager, the marketing of the subject property was scheduled to begin on June 13, 2019, and terminate on September 30, 2019.

On June 18, 2019, a water supply line valve on the second floor of the building "just let go," directly causing water damage to two or three apartments and water to infiltrate portions of the building's common areas.  Fortunately, plaintiff's property manager was on-site at the time of the valve failure and immediately shut off the water service to the building, limiting the potential damage.

The property restoration firm was immediately called back to the subject property, and according to its representative, it took approximately five days for the building to "dry-out" after

---

[6]  Defendant's housing inspector issued seven Certificates of Habitability dated March 1, 2019.
[7]  Plaintiff's property manager is also plaintiff's real estate agent.
[8]   During trial, plaintiff submitted an estimate from its general contractor dated April 1, 2019, detailing many of the remaining punchlist items.  In addition, plaintiff offered invoices from their contractors for the punchlist repairs dated March, April, May, and June 2019.





installation of dehumidifiers and air exchangers. As a result of the valve failure, kitchen cabinetry and drywall in two apartments was removed to enable plaintiff's plumbing contractor to make repairs. The valve failure also caused damage to approximately ten feet of cast iron piping running between two apartments, requiring replacement by plaintiff's plumber. These repairs were completed by plaintiff's plumber on June 24, 2019. In addition, due to the valve failure, plaintiff's electrical contractor replaced damaged wiring and electrical fixtures in Apartment 3. This work was also completed on June 24, 2019.

Thereafter, the property restoration firm replaced the water damaged drywall, flooring, and painted. According to the property restoration firm's representative, these repairs were "cosmetic" and not structural. The property restoration company completed its work by July 1, 2019.

In or about July 2019, plaintiff and Keller Williams Realty entered into an amended Exclusive Right to Rent/Lease Agreement, to begin on August 1, 2019, and terminate on October 31, 2019. According to plaintiff's property manager, the commencement date was delayed because "we felt that the property was just not ready for showing, there was some issues that we wanted to address."

One of plaintiff's partners testified that, "we were quite concerned that, especially in view of what happened in June that, we would have tenants in apartments and that there would be an issue which would require us to shut down that apartment or that line, and we just didn't want to face that situation." Accordingly, following the valve leak repairs, plaintiff voluntarily undertook replacement of certain wastewater discharge pipes in the subject property. This work was completed by plaintiff's plumber in August 2019.

Plaintiff welcomed its first tenant back to the subject property sometime in mid- to late August 2019.






On October 1, 2019, defendant's municipal tax assessor imposed an added assessment for the improvements completed to the subject property in the sum of $3,250,400. Defendant's tax assessor testified that, in or about the "spring or summer of 2019," he and an appraiser retained by defendant to perform "commercial apartment valuations" conducted an inspection of the subject property for purposes of determining the subject property's total added assessment. Defendant's municipal tax assessor prorated the added assessment for nine months, from April 2019 to December 2019, in the sum of $2,437,800. According to defendant's tax assessor, he viewed the apartment complex as a single economic unit; thus, he calculated the nine-month added assessment from the first day of the month following the month when the last Certificate of Habitability was issued. For the 2020 tax year, the subject property bore a total local property tax assessment of $4,006,200 (Land: $560,000, Improvements: $3,446,200).

On January 24, 2020 and May 22, 2020, respectively, plaintiff timely filed complaints with the Tax Court challenging the subject property's 2019 tax year nine-month prorated added assessment and 2020 tax year assessment. Montclair filed counterclaims of the 2019 tax year nine-month prorated added assessment and 2020 tax year assessment. The court tried the matters to conclusion over one day.

Plaintiff does not charge that the added assessment was not authorized under law, nor does plaintiff contend that the added assessment was untimely, under N.J.S.A. 54:4-63.3. In fact, plaintiff does not contest the total 2019 tax year added assessment amount. Rather, plaintiff argues that because of the ongoing windows repairs, flooring repairs, and water valve failure in June 2019, the subject property was not "substantially ready for the use for which it was intended" until August 2019, as such phrase is construed under N.J.S.A. 54:4-63.1. Accordingly, plaintiff maintains that defendant's 2019 tax year nine-month prorated assessment was inappropriate.

   

Additionally, plaintiff argues that it experienced difficulties leasing the subject property and attaining a stabilized occupancy due to the COVID-19 pandemic. Therefore, plaintiff asserts that in arriving at the subject property's 2020 tax year local property tax assessment, a higher vacancy allowance should have been applied by the defendant, resulting in a lower local property tax assessment.

## II.     Conclusions of Law

### A.     Added assessments; 2019 tax year added assessment

As expressed by our Supreme Court, a fundamental tenet of the New Jersey Constitution of 1947 was to ensure an "equality of treatment and burden; . . . a means of realizing uniformity and equality, the preeminent consideration [is] in the apportionment of the tax burden in virtue of the constitutional guaranties of due process and the equal protection of the laws." Switz v. Middletown, 23 N.J. 580, 593 (1957).

To adhere to this constitutional principle, our Legislature mandated that:

> All real property shall be assessed to the person owning the same on October 1 in each year. The assessor shall . . . determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments, as hereinafter required.
>
> [N.J.S.A. 54:4-23.]

The added assessment statute is a corollary of N.J.S.A. 54:4-23, designed to capture a property's increase in value due to the completion of a building, structure, addition, or improvement after the October 1 valuation date, but either by the end of the pre-tax year, or during January to October of the tax year. See N.J.S.A. 54:4-63.2; N.J.S.A. 54:4-63.3. The "purpose of the added assessment law is to permit the taxation of real property which becomes taxable during






the year following the assessment date of October 1 [under N.J.S.A. 54:4-23], in order to avoid having properties escape taxation until the next assessment date arrives." Snyder v. Borough of South Plainfield, 1 N.J. Tax 3, 7 (Tax 1980).

For a building or structure that has been constructed, added to, or improved after the October 1 valuation date and before the January 1 start of the tax year, an added assessment will be imposed for the entire subsequent tax year. N.J.S.A. 54:4-63.2. In addition, an added assessment will be imposed for that portion of the pre-tax year of completion from the first day of the month following completion through December 31. Ibid.

However, if a building or structure has been constructed, added to, or improved after the October 1 pre-tax year assessment date, and between January 1 and October 1 of the tax year, the added assessment computation slightly differs. N.J.S.A. 54:4-63.3. The assessor must first determine the taxable value of the improvements as of the first of the month following completion of the improvement, and then assess the amount in excess of the assessment made as of the preceding October 1 date. Ibid. The added assessment is then prorated by multiplying the excess value by the months remaining in the tax year, divided by twelve. Ibid.

Specifically, N.J.S.A. 54:4-63.3 provides, in part, the following:

> when any parcel of real property contains any building or other structure which has been erected, added to or improved after October 1 and completed between January 1 and October 1 following, the assessor shall, . . . determine the taxable value of such parcel of real property as of the first of the month following the date . . . of such completion, and . . . if such value so determined exceeds the assessment made as of October 1 preceding, the assessor shall enter an assessment, as an added assessment against such parcel of real property, in the 'Added Assessment List, 19. . . ,' which assessment shall be determined as follows: by multiplying the amount of such assessment or such excess by the number of whole months remaining in the calendar year after the date of delivery of such deed, or of such completion, and dividing the result by 12.






[N.J.S.A. 54:4-63.3.]

Here, it is undisputed by plaintiff that added assessments are statutorily sanctioned. Moreover, plaintiff concedes that on October 1, 2019, defendant's municipal tax assessor was permitted to, and lawfully imposed an added assessment on the subject property, under N.J.S.A. 54:4-63.3. At issue is the date when the subject property should be viewed as being "completed," under N.J.S.A. 54:4-63.1, for purposes of imposing the added assessment.

A structure is deemed "completed" when it is "substantially ready for the use for which it was intended." N.J.S.A. 54:4-63.1. However, the lack of issuance of a certificate of occupancy does not, *per se*, render the building, structure, or improvement, not substantially ready for *ad valorem* taxation purposes. See Beranto Towers v. City of Passaic, 1 N.J. Tax 344, 349 (Tax 1980).[9] As succinctly expressed by Judge DeAlmeida, "[a] certificate of occupancy is not an official determination that the structure is substantially ready for its intended use." Lowe's Home Ctr., Inc. v. City of Millville, 25 N.J. Tax 591, 600 (Tax 2010). Moreover, our courts have expressed that the term substantially ready should not be construed as requiring the building or structure to be "actually . . . in use." Howell Twp. v. Monmouth County Bd. of Taxation, 18 N.J. Tax 149, 163 (Tax 1999). Thus, it is not necessary for the owner or tenant to have assumed occupancy and use of the building for its intended purpose, for the court to find that it is substantially ready.

---

[9] A certificate of occupancy is issued when a project "meets the conditions of the construction permit, and all prior approvals and has been done substantially in accordance with the code and with those portions of the plans and specifications controlled by the code," when "all required fees have been paid in full," when "all necessary inspections have been completed," when "all violations have been corrected and . . . any assessed penalties have been paid," and when "all protective devices and equipment" are installed and operational. N.J.A.C. 5:23-2.24.






Rather, our courts have employed two tests to gauge whether the building or structure is substantially ready for its intended use. The economic viability test requires the court to discern whether construction has "reached the point where an economically viable structure" exists as of the probative evaluation date. Beranto Towers, 1 N.J. Tax at 349 (citing Forest Hills, Inc. v. Tax Commission, 293 N.Y.S. 2d 58 (App. Div. 1968), aff'd o.b., 23 N.Y.2d 949 (Ct. App. 1969)). The functionality test centers on whether the building or structure could be used for its intended purposes. Litton Business Sys., Inc. v. Borough of Morris Plains, 8 N.J. Tax 520 (Tax 1986), aff'd, 9 N.J. Tax 651 (App. Div. 1988).

In Texas Eastern Transmission Corp. v. East Amwell, the taxing district imposed an added assessment on seven miles of natural gas transmission pipeline that had been installed in the taxing district. 82 N.J. Super. 593 (App. Div. 1964). As of the assessing date, 79% of the 44-mile pipeline was "laid and backfilled" and was hydrostatically tested and 8-miles "remained to be laid and backfilled." Id. at 596. The taxpayer elected not to remove the water from, and to clean the transmission pipeline because "it was more convenient for the company to do those finishing operations at one time for the whole . . . section between pumping stations." Id. at 597.

The taxpayer argued that the pipeline was not substantially ready for its intended use because "the line as a whole . . . was to constitute an integral functional portion, [and] was far from ready to be used by that date for its intended purpose of transmission of gas." Ibid. However, our Appellate Division flatly rejected the taxpayer's argument finding that it amounted to a "misapprehend[ing] both [of] the underlying purpose of the Added Assessment Act and the basic philosophy of *ad valorem* taxation." Ibid. The court stated that:

> Assuming for the moment . . . that the portion of line . . . was physically completed by October 1 to the degree that it was substantially ready to be incorporated into the line as a whole when






the latter should be ready to receive it as an operating segment, . . . this is all that is required to meet the intent of the statute in respect of the assessability of the portion of the line situate in the taxing district . . . . Ad valorem taxation is imposed in respect of the physical presence of property in a taxing district, by reason of which it is in presumptive enjoyment of the protective and other benefits of local government. And the statement appended to the bill which was enacted in 1941 as the Added Assessment Act evinces the same philosophy in relation to construction newly completed which would otherwise escape taxation. The general policy of our taxing statutes is that all property within the jurisdiction of the State should be taxed unless expressly exempted . . . .

Thus, if as of October 1 the portion of the pipe line . . . was itself substantially ready for incorporation into the pipe line as an entirety and for use as such, and was merely awaiting the readying of the line outside that municipality to receive it as part of the total operating mechanism, in the meantime fully enjoying the benefits of local government, there is no justification for delaying the taxation of the . . . portion in the interim. This, we take it, accords with the statutory intent in relation to a situation of this kind.

[Id. at 597-98 (internal citations omitted).]

Significantly, the court emphasized that the taxpayer's argument "in effect ignores the word 'substantially'. . .[i]f the Legislature meant to require 100% completion or readiness for use it obviously would have employed the qualifying adverb." Id. at 598. Because the court was satisfied from the evidence presented that the section of the pipeline in the taxing district was substantially complete, the court upheld the added assessment.

Here, credible testimony was offered by the property restoration company's representative, that it had "substantially complete[d]" the initial phase of the repair work identified under their contract with plaintiff in or about January 2018. Moreover, the evidence further disclosed that on or about December 27, 2018, defendant's housing inspector inspected the subject property and issued Certificates of Habitability to plaintiff for thirteen apartments. In addition, on or about January 26, 2018, defendant's Construction Code Division issued Certificates of Occupancy for






eight apartments.  The evidence further disclosed that on or about March 1, 2019, defendant's housing inspector reinspected the subject property and issued Certificates of Habitability for seven additional apartments.

Admittedly, the property restoration company remained on site until April 2019, and continued to make repairs to the subject property identified under five separate punchlists. Thereafter, plaintiff's own contractors performed the balance of the punchlist repairs.  Notably however, the court's review of the estimate for work to be performed, and invoices for work performed by plaintiff's contractors in March, April, and May 2019 discloses the relatively minor nature of the repairs being undertaken to the property including replacements of shower valves, kitchen sink valves, toilet flushometers, radiator valves, lighting fixtures, and the cleaning of various apartments.

The court readily acknowledges plaintiff's laudable goal to "to make sure that the building was ready for occupancy," and that "you put your best foot forward when you start leasing up, and you can't start leasing unless you are confident that the physical building won't have any setbacks. . . ."  However, that is not the barometer by which the court measures whether a building or structure is substantially ready and subject to taxation, under N.J.S.A. 54:4-63.1.  Rather, the inquiry centers on whether the building or structure could be used for its intended purposes, or whether it is an economically viable structure.

Plaintiff's choice to delay leasing until all potential repair issues in the subject property were resolved was purely a business decision.  Plaintiff's election to attempt to minimize the risks associated with operating a multi-family dwelling is of no moment to the court and does not render issuance of the Certificates of Habitability a fiction.  Moreover, it does not result in a finding by the court that defendant's municipal tax assessor's determination that the subject property was






substantially complete a fallacy.

After considering all the above-stated evidence, the court finds that in March 2019, the subject property was substantially ready for the use for which it was intended, under N.J.S.A. 54:4-63.1. Following issuance of the balance of the Certificates of Habitability and the property restoration firm concluding its services, the subject property was functional for its intended purpose, as a multi-family dwelling.[10]

Additionally, although the June 18, 2019 water valve failure was truly an unfortunate event, the court's review of plaintiff's invoices demonstrates that the direct damage was limited to two or three apartments and limited common areas. Although credible testimony was offered that it took several days for the affected interior surfaces to thoroughly dry, that did not render the other twenty-five or twenty-six apartments uninhabitable, nor impact plaintiff's ability to lease those other apartments. Although plaintiff's partner testified that plaintiff had to have the electrical and heating systems in the basement re-inspected, no evidence or testimony was offered that any of those building systems suffered any damage resulting in the inability to provide basic tenant needs, including water, electric, and heat to the subject property. Moreover, plaintiff offered no testimony or evidence that, due to the June 18, 2019 water valve failure, additional building permits were required or that additional Certificate of Habitability inspections of the affected apartments needed to be conducted.

Additionally, the court finds that defendant has offered no credible evidence warranting an expansion of the 2019 tax year nine-month prorated added assessment on the subject property.

Accordingly, the court rejects plaintiff's claims for relief from the 2019 tax year nine-

---

[10] The court was provided with copies of only twenty Certificates of Habitability. It was unclear from the trial record when Certificates of Habitability were issued for the other eight apartments.






month prorated added assessment, denies any relief sought by defendant under its counterclaim, and affirms the 2019 tax year nine-month prorated added assessment.

### B. 2020 local property tax assessment

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption of validity is "a construct that expresses the view that in tax matters, it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). The presumption of validity applies "until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). Accordingly, the plaintiff shoulders the burden of proving that a local property tax assessment is incorrect. Only through the introduction of "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and quantity to overcome the presumption," that a plaintiff fulfills this obligation. Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952).

The court, in evaluating whether the evidence presented meets the "cogent evidence" standard, "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Insurance Co. of Am., 142 N.J. 520 (1995)); see also Estate of Roach v. TRW, Inc., 164 N.J. 598 (2000); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997). However, the evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East






Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2004).

Only after a court has concluded that it been presented with evidence sufficient to overcome the presumption of validity, must it "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)); Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011). Even in the absence of a motion to dismiss, under R. 4:37-2(b), the court is nonetheless tasked with determining if the plaintiff has overcome the presumption of validity. If the court independently concludes that a plaintiff has not carried its burden, dismissal of the action is warranted, and the court need not engage in a further evaluation of the evidence to make an independent determination of value. Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992).

Here, plaintiff argues that in arriving at the subject property's 2020 local property tax assessment, defendant's appraiser and assessor should have applied a higher vacancy allowance to the income capitalization approach, resulting in a lower local property tax assessment. Specifically, plaintiff contends that due to the COVID-19 pandemic, they encountered difficulty in leasing the subject property, and thus, were not able to immediately attain full occupancy.

In support of plaintiff's contention, plaintiff offered only factual testimony from its property manager and one of plaintiff's partners. That testimony revealed that after commencing leasing activities on the subject property, in or about July 2019, plaintiff gained the following tenants: (i) one tenant, as of the end of August 2019; (ii) nine tenants, as of the end of September 2019; (iii) eleven tenants, as of the end of October 2019; (iv) fourteen tenants, as of the end of November 2019; and (v) seventeen tenants, as of the end of December 2019. The subject property did not attain one hundred percent occupancy until September 2021.

   

Plaintiff's property manager testified that "one of the biggest themes that occurred throughout [the leasing of the subject property] was that we had no on-site parking, that I would say was pretty major, and it definitely created a challenge, we are surrounded by buildings that have on-site parking, and it is very difficult to park in the town." The property manager added that "there were other factors that came up as far as renting, people not meeting criteria, thresholds for income, etc."

Plaintiff's partner similarly shared that the feedback received from prospective tenants included that, "we didn't have parking" and "additional concerns were that . . . it's a pre-war building, it's not new enough for us, . . . we're looking for something more modern." Moreover, according to plaintiff's partner, following the COVID-19 outbreak in or about February/March 2020, leasing activities on the subject property materially diminished.

Notably however, plaintiff offered no expert testimony or evidence regarding what potential gross income should be attributed to the subject property for the 2020 tax year, or what stabilized vacancy and collection loss factor was reasonable for multifamily dwellings in the marketplace. Moreover, plaintiff offered no expert testimony or evidence with respect to the subject property's stabilized operating expenses or the capitalization rate that should be employed in deriving a value to the subject property for the 2020 tax year.

In short, plaintiff has offered no meaningful evidence demonstrating that the subject property's 2020 tax year assessment was inaccurate, or that defendant's method of assessment was so palpably egregious and defective that the presumption of validity should not apply. Plaintiff has not presented any cogent evidence of the subject property's value sufficient to overcome the presumption of validity that attached to the 2020 tax year assessment.






Accordingly, for the foregoing reasons, the court affirms the subject property's 2020 tax year assessment.

## III. Conclusion

For the above stated reasons, the court finds that the subject property's 2019 tax year nine-month prorated added assessment was reasonable and supported by the evidence. In addition, the court finds that no credible and cogent evidence was offered by plaintiff to overcome the presumption of validity that attaches to the subject property's 2020 tax year assessment.

Therefore, the court affirms the 2019 tax year nine-month prorated added assessment and 2020 tax year assessment.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.

