NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
 P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 943-4761
 TeleFax: (609) 984-0805
taxcourttrenton2@judiciary.state.nj.us

April 20, 2017

Michael A. Vespasiano, Esq.
331 Main Street
Chatham, New Jersey 07928

Levi Kool, Esq.
O'Donnell McCord, P.C.
1725 Highway 35, Suite C
Wall, New Jersey 07719

> Re: State Street Bank v. Township of Wall
> Block 913, Lot 24
> Docket Nos. 008475-2011, 006025-2012, 003317-2013, 003982-2014, 002841-2015

Dear Counsel:

This is the court's opinion following trial in the above captioned matters. Plaintiff contests the local property tax assessments on the property ("Subject") located in defendant ("Township") for tax years 2011-2015. The average ratio for each year was 60.89%; 61.32%; 65.38%; 68.17%; and 65.82%.

Each party presented an appraisal expert witness, whose reports were admitted into evidence without objection.[1] Each expert's value conclusion, as compared to the assessment and the implied true value, by year, was as follows:

---

[1] The Township's report included tax year 2016 for which tax year the Subject was assessed at $36,142,900 (allocated $3,878,000 land and $32,264,900 improvements), and the average ratio was 100%. The parties agreed that 2016 should not be considered as part of the trial, and that the Township's expert's opinion and value conclusion would not change due to the removal of tax year 2016 from the expert report.

\*

| Tax Year | Assessment | Implied Value | Plaintiff's Expert | Township Expert |
|---|---|---|---|---|
| 2011 | $17,600,000 | $28,904,582 | $18,750,000 | $41,095,000 |
| 2012 | $17,600,000 | $28,701,892 | $19,970,000 | $42,675,000 |
| 2013 | $17,600,000 | $26,919,547 | $20,100,000 | $44,382,000 |
| 2014 | $17,600,000 | $25,817,808 | $20,650,000 | $44,982,000 |
| 2015 | $17,581,300 | $26,711,182 | $21,400,000 | $49,682,000 |

Both experts agreed as to the physical characteristics of the site and improvements; that the Subject had been built by, and for use of, New Jersey Natural Gas Company ("NJNG") in 1982; and was subject to a sale-leveraged leaseback to NJNG by its parent in 1995 in which plaintiff was the lessor. They also agreed that as of the valuation dates NJNG occupied the Subject as its corporate headquarters, and that the Subject had three other tenants who occupied about 5% of the total area of about 157,500 square feet ("SF").

Both experts used only the income approach to value the Subject, and used primarily multi-tenanted office buildings as comparables for this purpose. The essential disagreement between the experts centered on whether the Subject should be considered as a multi-tenanted office building or as a headquarters-type, single-tenanted office building. Plaintiff's expert contended the former was appropriate since a portion of the Subject had always been intended for use by multiple tenants, as evidenced by a site map demarcating the area by suite numbers and by the fact that it was actually leased to three tenants during the tax years at issue here. The Township agreed with plaintiff that the Subject was not the unique, expensive, or special-purpose type of headquarters, however, maintained that it must be valued as a large single-tenanted type building. This was because the Subject was built specifically for use as NJNG's headquarters, as further evidenced by its layout, amenities, limited elevators, large-scale occupancy, and location of NJNG's garage and maintenance facility across the street. Thus, per the Township, plaintiff's expert's highest and best use of the Subject as a general multi-tenanted office building was incorrect, especially since

it was void of conversion costs/feasibility in this regard. Alternatively, the Township argued that plaintiff's expert's value conclusions should be rejected since his rental comparables were all of spaces measuring half (or less) of the Subject's size, thus, unreliable indicators of the Subject's true value.

For the reasons stated below, the court agrees with the Township's expert that the Subject is characteristic of a single-tenant, corporate headquarters-type facility as opposed to a multi-tenanted office building. However, neither expert's comparable leases allow the court to determine the Subject's potential gross income, the first step in an income approach, due to certain issues as to their comparability. The court therefore affirms the assessments for all tax years.

**FACTS**

The Subject is located on Wyckoff Road, and proximate to State Highways 34 and 33, and the Garden State Parkway. It consists of 22.16 acres of land. The general area is comprised of commercial and industrial buildings and is zoned for OR-10 "Office Research." A portion of the Subject land is covered by wetlands and a detention basin.

The Subject is improved by a three-story, Class A office building measuring about 157,500 SF, currently being used by NJNG as its corporate headquarters. The building has a cafeteria, conference rooms, computer room, copy room, fitness center, mechanical rooms, plus office space. It has central heating and air conditioning, and two three-stop elevators, of which one is a freight elevator. There is also a loading dock in the rear of the building.

The building has a glass atrium and two adjoining "wings" (on the left and right side of the building). The main entrance from the parking lot is the atrium's second floor, which opens to a lobby. The lobby has a reception desk, beside which is a counter-area labeled Customer Service that is meant for NJNG customers. A large placard advertising NJNG's excellence in customer

3

service is propped against the pillars facing the glass door entrance. There is also a display area with NJNG's literature and advertising. An elevator is located at the end of the hallway past the customer service area. That hallway has basic tiled walls.

Large stairwells in the atrium provide access through the building. The staircase to the third floor leads to an open area landing. Each wing contains distinct office suites with open office space, private offices, employee break area (for NJNG staff), and conference rooms. Office areas are divided into engineering, human resources, legal department, and the like. These areas comprise open-air cubicles, with closed-space offices (with doors and a ceiling) in the perimeter. The third floor contains the executive offices. The hallways here have painted walls, framed pictures, and furniture. The amenities (carpeting, waiting area, and offices) here are of higher quality than in the rest of the building. The computer room and boiler room are dedicated to NJNG, with the computer room having raised floors and being separately cooled. There is also a large room dedicated to copying/printing for NJNG use only.

The site also includes an asphalt-paved parking lot for over 600 vehicles. The signage at the entrance includes the names of NJNG and the other three tenants. Reserved or assigned parking spaces are only for NJNG.

A brochure titled Monmouth Shores Corporate Office Park (dating back to the Subject's construction) described the features of the building used as the "Corporate Headquarters of New Jersey Resources Corporation and its Principal Subsidiary, [NJNG]." The brochure noted that while the building's design was "basic" and of "standard construction materials appropriate for a corporate headquarters facility," the Subject, which was the "new headquarters" for NJNG and its parent, contained state-of-the-art, energy efficient features. The brochure noted that one of the parent's subsidiaries, Commercial Realty and Resources Corporation ("Commercial Realty"),

4

"undertook" the building of the Subject. It stated that the building had private office, individual and "group partitioned work stations" which could be "easily reconfigured to fit changing corporate needs," as were the conference rooms and the Board of Directors' rooms, which could be further divided into smaller areas, or opened up into one large room. It noted that the building's "open-space concept" accomplished the same (and more) flexibility. The brochure emphasized the inclusion of a data processing center ideal for large-scale operations (due to the large customer base) and expandable as corporate needs changed. Last, it noted that the Township was ideally suited for NJNG to concentrate its administrative and support services in a centrally located headquarters, which would result in time and cost savings.

The December 21, 1995 Amended and Restated Leveraged Lease Agreement between plaintiff and NJNG (with $1,656,228 as the base annual rent for the tax years at issue) provides that NJNG would assume the existing leases on the same terms and conditions (but those assumed leases would also act as security for NJNG's lease payments). Further, NJNG could, without the lessor's consent, "sublease all or any portion" of the Subject "to any affiliate" of NJNG. However, it could only "sublease less than substantially all of the [Subject] to any" other person. Other than these sub-leases, NJNG was not permitted to "assign its right, title and interest in" the lease. Neither expert used this lease to determine the Subject's true value.

On the same day, December 21, 1995, NJNG by a lease agreement, sub-leased a portion of the first floor to Commercial Realty, the other subsidiary of NJNG's parent. Commercial Realty, in turn, sub-leased such portion to three tenants. Each was a short-term lease subject to further renewals. Each lease specified that the only permissible use was for office purposes. Each sub-sub tenant was entitled to be listed in the "building directory," as well as to a certain number of unassigned parking spaces. The three sub-sub leases were as follows:

5

(1) 2,262 SF (plus 339 SF of common area) to United Way of Monmouth County at $4,010 per month (increased to $4,550 at the latest renewal), on a net basis with the sub-sub tenant bearing 1.65% of the operating expenses including real estate taxes, and all costs for "excess building hour usage" of utilities. Sub-sub tenant was entitled to signage in the "building directory" at its cost and to nine unassigned parking spaces. Commercial Realty agreed to repaint drywall surfaces, replace carpet, install new wall base, remove existing wall, relocate existing door, and remove another door.

(2) 4,261 SF (plus 639 SF of common area) to Monmouth Ocean Hospital Service Corp. at $9,595 per month, with the sub-sub tenant bearing 3.12% of all operating expenses, and additional charges for utility usage during non-business hours. Use of the "main-frame computer equipment and related HVAC equipment" was payable by the sub-sub tenant since it was to be "separately metered." The sub-sub tenant was entitled to 50 "unassigned parking spaces," of which 30 were to be used for "training classes only." Commercial Realty agreed to provide certain "tenant improvements," which included building partitioning and installing, among others, HVAC "diffusers" for proper air distribution, 110-volt duplex receptacles, "local switching," and dimmers.[2]

(3) 865 SF (plus 130 SF of common area) to EFI Global at $1,700 per month, on a net basis with the sub-sub tenant bearing 0.63% of the operating expenses including real estate taxes, and all costs for "excess building hour usage" of utilities. Sub-sub tenant was entitled to signage in the "building directory" at its cost and to six unassigned parking spaces only in the employee parking area (as opposed to visitor parking area).

Neither expert relied upon these three leases in determining the Subject's value.

## VALUATION

*(A) Experts' Highest and Best Use Conclusion*

Plaintiff's expert determined that the highest and best use ("HBU") of the Subject was for "office development," as vacant, noting that it would be "financially feasible" to erect a "build-to-suit, owner occupied or investment grade office." As improved, he concluded the highest and best use as its "current office use," noting that the Subject was being used as NJNG's corporate headquarters. The expert testified that he nonetheless viewed the Subject's HBU as multi-tenanted based on (1) the actual presence of multiple tenants, (2) the demarcation of office spaces on a floor-plan sketch, (3) confirmation from a building manager that the Subject was intended to always be

---

[2] Plaintiff's expert noted that at his most recent inspection, the hospital had vacated the premises and the space was being prepared to be occupied by an accounting firm.

6

multi-tenanted, (4) his opinion of a weak market for single-tenanted corporate headquarters which had been selling "for peanuts," therefore a multiple-tenanted building would give the owner a hedge against losses and a maximal value, and, (5) his opinion that the Subject could be easily carved up for multi-tenant use.

The Township's expert concluded that, as vacant, the Subject's HBU would be its development as permissible by and consistent with the local zoning and land use laws. As improved, his report concluded the HBU to be the Subject's continued use as an office building facility. He testified that this conclusion should have included a reference to use as a corporate headquarters-type office building.

*(B) Experts' Valuation Conclusions*

Each expert rejected the cost approach but for different reasons. Plaintiff's expert deemed it unreliable due to the Subject's age, thus, estimating depreciation would be problematic, plus there were very few comparable land sales the size of the Subject with a portion of wetlands. The Township's expert did not consider the cost approach viable because although the building was built for, and continually used as, NJNG's corporate headquarters, it was not a special purpose building or so unique as to merit the use of such methodology. Both experts therefore used an income approach.

Plaintiff's expert found "no comparable rentals of single Class A office building available in the subject's market area" and instead used twelve leases of multiple-tenanted buildings (eight of them in corporate office parks). Lease dates ranged from 2008 to 2015. The leased spaces were located in Monmouth and Middlesex counties. The largest-sized leases were Comparables 8 (69,980 SF leased to Bracco Diagnostics in Middlesex County for use as corporate headquarters, located in one building of the 14-building corporate park, with the leased building being multi-

7

tenanted), and 11 (70,000 SF leased to Asbury Park Press in Monmouth County, with an atrium and onsite cafeteria). Comparable 4 was a single-tenanted building leased to Ameri-Health, measuring 32,898 SF for use as corporate headquarters, and was located in the same corporate park as Comparable 8. The size of the remaining comparables ranged from 3,618 SF to 27,635 SF. All leases were reported to be on a modified gross basis, although plaintiff's expert later testified that two were on a net basis. None had a gym or a grand entrance. Some had cafeterias. He adjusted Comparables 1, 3, 4, 11, and 12 for superior condition based on recent renovations, Comparable 6 for inferior condition and age, Comparables 4 and 8 for superior location near a preferable highway exit submarket, Comparables 7 and 10 for their superior location within Red Bank Borough, "which is a superior municipality based on its economic conditions." He also adjusted Comparable 1 for negative market conditions based on the rate at which rents dropped the last quarter of 2008 per a market study (not included in his report). He did not adjust for size as "rental rates are not affected due to differences in Class A office spaces."

Using comparables closest to the relevant assessment date for each of the tax years at issue, plaintiff's expert concluded a per SF ("PSF") rental of the Subject at $22.50 in 2011, $23.00 in 2012-2013, and $23.50 in 2014-2015 (which approximated the Subject's existing three leases of $21, $23.50, and $20.50 PSF). He then applied a stabilized vacancy and credit loss rate of 12% for 2011-2013, and 10% for 2014-2015. While the Cushman and Wakefield Marketbeat for Central New Jersey as well as the Monmouth County annual rates ranged from 12.9% to as high as 28.1% in Monmouth County, he used a lesser figure due to the Subject's fully occupied status. His operating expenses were $.20 PSF for insurance; $2.00 PSF for utilities; $2.50 for maintenance; $.40 PSF for reserves; $2.00 PSF for tenant improvement ("TI") allowance. Management and commissions totaled 8% of effective gross income. General and miscellaneous

expenses totaled $.20 PSF. To the net operating income, he chose a capitalization rate based on corporate bonds adjusted "to account for the added risk including management, non-liquidity and functional obsolescence." For each tax year at issue, the rate was 7.5%, 7.2%, 7%, 7.3%, and 7% to which he added the effective tax rate because the rents were on a gross modified basis. He then concluded the following values for each respective tax year: $18,750,000; $19,970,000; $20,100,000; $20,650,000; and $21,400,000.

The Township's expert used large leased spaces in multi-tenanted buildings since there was a limited market for large single-tenanted buildings, and he opined that large leases in multi-tenancy are comparable to the Subject because those tenants seek similar finishes, amenities, and qualities as would single-tenants in Class A buildings. He used eight leases, with lease dates ranging from 2009 to 2014. Each leased property was located over 20 miles from the Subject, and none were located in Monmouth County.[3] Only one (Comparable 5) was single-tenanted. Almost all were chronologically newer than the Subject, or had been recently renovated. One comparable (Comparable 7, a 60,000 SF space in a 4-story multi-tenanted building built in 2011, leased to Princeton Healthcare System) was re-classified from Class 4A to Class 15F for tax year 2013 onwards.[4] The leases were all triple net and the sizes ranged from 60,000 SF to 498,115 SF. He made no size adjustment because the comparables' tenants would constitute the market for the Subject, and would seek similar quality and space as the Subject. Per the expert, at these sizes, "quality is more valuable" in the search for comparable leases. He made only one adjustment for

---

[3] The leases in Morris County were Comparable 1 (100,000 SF at $30 PSF); Comparable 5 (270,000 SF at $26.50 PSF); and Comparable 6 (173,150 SF at $22.50 PSF). Comparable 2 was in Somerset County (110,937 SF at $29 PSF for a one-year term). Leases in Middlesex County were Comparable 7 (60,000 SF at $28.50 PSF) and Comparable 4 (498,115 SF at $32.28 PSF). Comparable 3 was in Mercer County (112,888 SF $24.51 PSF). The Union County lease was Comparable 8 (61,726 SF at $16.06 PSF).

[4] Class 4A represents "commercial" property, which is income-producing but excludes vacant land, residential, farm or industrial properties, or apartments. N.J.A.C. 18:2.2-2(e). Class 15F references tax-exempt property, which is exempt for reasons other than being owned by schools, government, religious and charitable organizations or being used as a cemetery/graveyard. N.J.A.C. 18:12-2.2(q).

inferior condition for Comparable 6.  The range of rents from $16.06 PSF to $32.28 PSF allowed him to select $26.50 PSF for the Subject for all tax years.  He conceded that he would place little weight to Comparable 2 (of 110,937 SF with a lease date of May 2009) for later tax years at issue here since it was only for a one-year term.

He applied a vacancy and collection loss factor relying upon a survey by PriceWaterhouse Coopers which showed rates from 2-12.5% in 2010 (October), 0-12.5% from 2011-2012; 0-15% in 2013, 0-12% in 2014.  He used 3% for all tax years due to the Subject's fully occupied status by a credit tenant, its status as a Class A building, and since the Township had a high demand for office space (small to mid-size).  His estimated expenses were 2% for reserves, 5% for leasing commissions, 3% for management fees, and $2 PSF for TI allowance based on landlord contribution in comparable leases.  To the net operating income, he applied a capitalization rate using the band of investment method, supported by ACLI and Korpacz Real Estate Investor surveys at 8.1%, 7.8%, 7.5%, 7.4%, and 6.7% for each respective tax year.  This provided a value conclusion of $41,095,000; $42,675,000; $44,382,000; $44,982,000; and $49,682,000 for each respective tax year.

**ANALYSIS**

A complainant carries a dual burden: first of overcoming an assessment's presumptive correctness, and thereafter, persuading the court what the correct value of the property should be. MSGW Real Estate Fund, L.L.C. v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377 (Tax 1998); Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J. Tax 153 (Tax 1998).  If the court finds that plaintiff has failed to overcome the presumptive correctness of the assessment, and the taxing district makes no claim for assessment adjustment (either as a counterclaim or through evidence), the court can affirm the assessment.  MSGW, supra, 18 N.J.

10

Tax at 378-79. "[A]n expert should fully document his opinion," thus, an expert's opinion that is "unsubstantiated" merits no attention. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 280 (1985); see also MSGW, supra, 18 N.J. Tax at 376 ("plaintiff must present evidence sufficient to demonstrate that the appeal is based on sound theory and objective data rather than on mere wishful thinking").

Here, viewing plaintiff's proofs with all favorable inferences (since the Township moved to dismiss the appeals), the complaints do not merit dismissal for failure to overcome the assessments' presumptive correctness. Plaintiff's expert's conclusion that the Subject was a Class A office building but not special purpose or unique was undisputed. His use of an income approach for the Subject's valuation was reasonable and supported by precedent. The viability of his HBU conclusion and consequent valuation conclusion does not merit a dismissal of the complaints without examination of all proofs provided. Rather, it puts into issue the credibility of proofs, which has to be examined under a preponderance standard. See MSGW, supra, 18 N.J. Tax at 375-77.

The first basic but indispensable element of the true market value of a property is discerning its HBU. This analysis requires sequential consideration of "the following four criteria, determining whether the use of the subject property is: (1) legally permissible; (2) physically possible; (3) financially feasible; and (4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). In conducting a highest and best use analysis, a property "should be examined for all possible uses and that use which will yield the highest return should be selected." General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 125 (Tax 2005) (quotations omitted). A strong consideration in the analysis is the actual use of the subject property. Ford Motor, supra, 10 N.J. Tax at 167.

11

In deciding HBU in the context of single or multiple tenancy, this court has considered expert analyses of the building's layout, original design or intended use, cost/feasibility of converting to multi-tenanted use, and lease history. Thus, in Litton Business Systems, Inc. v. Morris Plains Borough, 8 N.J. Tax 520, 533-34 (Tax 1986), aff'd, 9 N.J. Tax 651 (App. Div. 1988), the Tax Court found that the property was designed for a single user's open office space, with no partitions in one of the buildings to divide tenants, and with limited number of elevators. Id. at 523-25. The property was used as plaintiff's corporate headquarters, and was never rented to other parties. Id. at 526. The court agreed with defendant's expert that "the design and layout of the subject [was] not suitable for multi-tenant use because of insufficient lobby areas, the location of elevators and security problems" posed by the multiple buildings. Ibid.

In American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000), the Tax Court found the subject's HBU was a single-tenant lease in each of the two buildings, measuring about 377,000 SF and 169,000 SF respectively (which were functionally integrated and operated as a single economic unit, an office complex). Id. at 547. The property used to be headquarters of plaintiff until it was sold, and as a result, became vacant. Id. at 548. In connection with its HBU conclusion, the court considered the cost of converting to multi-tenant use, including "new lobbies in the Main Building, installation of a new stair tower in the West Building," and additional costs. Id. at 549. The court also relied on testimony from a marketing expert that multi-tenant use was "impractical in the market" and that "the entire complex was designed for a single user, although a single user in each building was conceivable." Id. at 551.

Here, both experts agreed that the Subject, although being built and used as corporate headquarters, was nonetheless not a unique, lavish structure typically sought for an owner-

12

occupant, or a single tenant, but rather, was a Class A office building. Plaintiff's expert opined that the Subject's HBU as vacant was for "office development" since it was "financially feasible" to erect a "build-to-suit, owner occupied or investment grade office." Yet he testified that the Subject's HBU as multi-tenanted building was appropriate. Similarly, the expert's opinion of the Subject's HBU as improved was its "current office use," and noted that the current use was as NJNG's corporate headquarters. Yet he testified that the Subject was comparable to small-spaced tenancies in multi-tenanted buildings.

Although his testimony of the Subject's HBU as multi-tenanted differed from his report's conclusion, that testimony was not borne out by objective proofs. He stated that there was a weak market for single-tenanted corporate headquarters yet conceded that the Subject never suffered vacancy and was never marketed as multi-tenanted. Further, the alluded-to data was not included in his report nor provided to the court during testimony.

He opined that the building could be easily re-designed, and the HVAC system or other amenities could easily be reconfigured, so it was functional and operative for multiple tenants with no significant cost incurrence. This opinion was purely subjective. He had not viewed any architectural plans. His contention that the wide staircases were fully accessible and permitted a free flow of traffic, does not equate to a cost-based or other design/engineering backed analysis that the lack of sufficient elevators (located inconveniently) was of no moment. Equally subjective were his justifications that: (1) the fitness center could be easily switched to office use, with minimal effort and expense, since it is essentially a large floor area unlike a state-of-the-art commercial gym, (2) the central heat and air features could be re-designed to meet the needs of an individual lessee, and (3) magnetic security badges for tenants and the tenants' staff could allow co-existence despite the current lack of an entrance lobby/security desk. He noted that an amenity

13

for a multiple-tenancy would be multiple heating/cooling zones, however he was unsure if the Subject had multiple heating zones. He agreed that if the Subject had to be retrofitted with a new HVAC system it would likely not be financially feasible. He had not prepared (or obtained) any analysis to calculate the cost of demising separate heating/cooling zones in the Subject (nor had plaintiff obtained any cost report in this regard). Without such cost analysis, the court is hard-pressed to be convinced that the alterations and/or renovation costs are so minimal that they will add nothing to the Subject's existing value. See, e.g., Appraisal Institute, The Appraisal of Real Estate, 346-47 (14th ed. 2013) (modification or alteration to improvements "must add at least as much value to the property as it costs" in order to be financially feasible, so that the post-alteration value less alteration costs must be greater than or equal to "the value of the property as is.").

His opinion that the existing three tenants evidenced that the HBU of the Subject was as a multi-tenanted building is unpersuasive. The tenants were sub-sub lessees, were not Class A tenants, and occupied about 5% of the total space in the headquarters. There was no showing that the sub-leased spaces were marketed by a commercial broker, nor any proof that the Subject was ever marketed as a multi-tenanted building.

The court finds more credible the Township's expert's opinion that the Subject would not attract the market of multiple tenancy due to its layout, design, one passenger elevator, one freight elevator, lack of prominent visibility which would be sought by Class A tenants, and lack of a lobby with prominent tenant-identifying signage. The court is also persuaded by the Township's expert's opinion, which was fully supported by the pictures in his report, that the building's overall design with the atrium and open landings on each floor, the varying quality of office space (executive versus non-executive) on each floor; the built-to-suit, raised-floor, specially ventilated, designated computer room, and the fitness center for NJNG's employees, are the hallmarks of a

single-tenant or a corporate headquarters for a single entity. His opinion that the ability of dividing office spaces and layout to erect separate rooms was geared only for NJNG's needs, not for unrelated entities, was similarly supported not only by the lease between plaintiff and NJNG, but also by the brochure explaining the features, amenities, and location of the building as being an exemplar of particularly efficient corporate headquarters. His conclusion that converting a corporate headquarters building into a multi-tenanted office building incurs potential significant conversion costs such as separate heating and cooling zones, and therefore requires a cost-to-retrofit analysis and test of whether the potential income versus such cost would provide the same or greater value, is in line with precedent in this regard. Finally, the location of NJNG's industrial building across the street for its vehicles and their maintenance cuts in favor of the Subject as being built for NJNG's single occupancy and use.

In sum, plaintiff's expert apparently found the presence of the three tenants sufficient to support the Subject's HBU as a multi-tenanted building, without a cost-benefit analysis of converting to multi-tenant use. The court disagrees with this approach. The simple logic of valuing the property as a multiple tenancy because there happen to be three non-Class A tenants, occupying a small portion of the Subject as a sub-sub lease, is undermined by the lack of corroborating data and analysis as to just how productive or feasible a marketed multiple tenancy could be. Without supporting data, this court must reject plaintiff's expert's HBU analysis since it does not pass the tests of physical possibility; financial feasibility; and maximal productivity.

Due to the flawed HBU analysis, several of plaintiff's expert's comparable leases do not lend themselves to being credible indicators of the Subject's value. The majority were leases of a tenant located in a multi-tenanted building. Those buildings did not have similar features as the Subject (size, layout, atrium, fitness center, specialized computer room, large-sized loading dock

15

area).  Only two of the twelve leases were used a corporate headquarters, and only two of those three leases were larger sized, yet still less than half the Subject's size.  The size, amenities, or characteristics, which distinguish the Subject as a corporate-headquarters, when absent from the comparable leases, render their comparability an issue.  See, e.g., Litton, supra, 8 N.J. Tax at 534 (property which was "built as a corporate headquarters office building," was not "unique," thus, could be compared "with similar single-occupancy office buildings in the area," however, "[m]ulti-tenanted buildings are not comparable because of physical differences" such as "absence of a lobby . . . , single elevators . . .  and the poor location of the elevators in all three buildings").[5]

Although the expert agreed that single-tenanted buildings were usually leased on a triple net basis, he maintained that it is not unusual to have a Class A building with modified gross and triple net rental tenants.  However, he did not explain how this impacts the rent, and how adding an effective tax rate captures any difference between the rent on a net versus modified basis.  See, e.g., MSGW, supra, 18 N.J. Tax at 388 (concluding that where the HBU is for "single tenant occupancy," the experts' use of "net rent" is persuasive since "comparable leases containing net rents are more reliable indicators of rental value than modified gross rent leases with adjustments for expenses."  This is because net leases "eliminate[] the uncertainty inherent in the amount of operating expenses to be deducted to translate a modified gross rent into a net rent"); American Cyanamid, supra, 17 N.J. Tax at 572 (agreeing with defendant's expert's opinion, which was similar to the Township's expert's opinion, that "a single occupant of an entire large building will pay rent on a net basis").

---

[5] Similar to the experts' agreement in the instant case, the property although used as a corporate headquarters, was "modest" and not of the singular lavishness of the type in CPC International, Inc. v. Borough of Englewood Cliffs, 193 N.J. Super. 261 (App. Div. 1984).  Litton, supra, 8 N.J. Tax at 533.

Considering all the above issues, the only three leases somewhat comparable to the Subject are 4, 8 and 11, which commenced August 2011, December 2012, and April 2014 respectively. However, the court has difficulty using them for all the tax years at issue here. Since all three commenced after October 1, 2010 (the assessment date for the first tax year at issue), they are of lesser assistance as to tax year 2011. The same would be true of Comparable 4 and 8 as to tax years 2014 and 2015. Comparable 11 would not assist for tax years prior to tax year 2014. Further, while he testified that two of his comparables were triple net rent, his report showed all as gross modified with the "tenant paying only electric of the leased space," thus he added an effective tax rate for each tax year regardless of their alleged triple net rent status. Therefore, the court is constrained to conclude that it does not have sufficiently reliable data to accomplish the very first step in an income approach, i.e., the potential gross income, for each tax year. This inability renders application of the remaining steps (vacancy rate, expenses, capitalization rates) futile.

Several of the Township's comparables were problematic for some of the same reasons as plaintiff's expert's comparables. There was no proof that these multi-tenanted buildings were similar to the Subject (i.e., with an atrium, fitness center, specialized computer room, large-sized loading dock area, differentiating quality-levels of office space). Only one comparable was single-tenanted. Two comparables were in eight-story buildings. One lease (Comparable 2, commencing May 2009 for space of 110,937 SF in Somerset county) was for a one-year term only, thus, cannot be credible as an economic rent indicator for later tax years at issue here. Also questionable was whether the location of the leases in distant counties such as Morris, Sussex, and Union affected the PSF rent. The expert's report simply stated "all comparables are" located "similarly" as the Subject. It does not explain whether there were economic differences in the real estate market in those counties, or alternatively that the price for commercial space by a Class A tenant would be

17

the same all over New Jersey. This is in contrast to plaintiff's expert's more credible adjustments to his comparable leases for superior location (location near a preferable highway exit submarket or due to superior economic market).

Even if it is assumed that location plays no role in a single-tenanted or corporate headquarters-type building (since both experts acknowledged that comparables similar in size and single-tenanted were difficult to locate), the Township's expert's unadjusted PSF rents span from $16 to $32, compared to plaintiff's expert's range of $21.90 to $27. See supra n.3. With regard to defendant's comparables, the question arises, for instance, why the rent for the 498,115 SF in Middlesex County was $2 PSF lesser than the 100,000 SF leased in Morris County, or why that same space in Morris County commanded about $5 PSF more than a slightly larger space in Mercer County (112,888 SF at $24.51 PSF), or why the space of 61,7226 SF in Union County was rented at $16.06 PSF whereas the 60,000 SF space in Middlesex County commanded $28.50 PSF. If size is irrelevant (both experts claiming that Class A space rents are not affected by size), then the sizeable difference to the PSF rents has to be attributable to some other factor. Yet the only adjustment made by the Township's expert was for one comparable, and that was for condition.

Therefore, the court finds that the Township's expert's comparable leases also do not lend themselves as reliable indicators of the Subject's potential gross income, the first factor to be decided in an income approach. This makes consideration of the remaining factors (vacancy rate, expenses, capitalization rates) futile.

## CONCLUSION

For the aforementioned reasons, the court finds that the proofs here do not allow the court to determine the Subject's potential gross income, thus, its value. The court is thus constrained to affirm the assessments for the tax years at issue. Judgments will be accordingly entered.

Very Truly Yours,

Mala Sundar, J.T.C.